## UNITED STATES ex rel. UNITED STATES BORAX CO. v. ICKES, Secretary of Interior. *

### No. 7023.

United States Court of Appeals for the District of Columbia.

Decided May 27, 1938.

---

*Writ of certiorari denied 59 S.Ct. 80, 83 L.Ed. ⸺

Samuel Herrick and Philip F. Herrick, both of Washington, D. C., for appellant.

Nathan R. Margold, Solicitor, Department of the Interior, Frederick Bernays Wiener, Jackson E. Price, and Harry M. Edelstein, all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the District Court of the United States for the District of Columbia dismissing the petition of the United States Borax Company, relator-appellant, hereafter referred to as appellant, for a writ of mandamus directing the appellee, Harold L. Ickes, Secretary of the Interior, to cause to be issued and delivered to the appellant a patent of the United States for 80 acres of land in California. The appellant asserted, under the mining laws of the United States, a right of patent to this land as a placer mining location. It appears that a rule was issued by the District Court against the appellee to show cause why a writ of mandamus should not issue, and that the appellee filed a return to the rule and an answer to the petition for mandamus. To this return and answer the appellant demurred. After a hearing upon the demurrer, the same was overruled. The appellant elected to stand upon the demurrer, whereupon the petition was dismissed and this appeal taken.

The facts in the case are as follows: Under the mining laws of the United States, "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in

which they are found to occupation and purchase. . . ."[1] "Claims usually called 'placers,' . . . shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims . . . ."[2] As a result of this provision a further enactment—that "no location of a mining-claim shall be made until the discovery of the vein or lode within the limits of the claim located."[3]—is applicable to placer claims. Donnelly v. United States, 228 U.S. 243, 266, 33 S.Ct. 449, 57 L.Ed. 820, Ann.Cas. 1913E, 710 (1913). In respect of placer claims the mining laws also provide that "no location of a placer-claim . . . shall exceed one hundred and sixty acres for any one person or association of persons,"[4] and that "no such location shall include more than twenty acres for each individual claimant. . . ."[5]

Under these statutes one Widdess and seven others, as an association of persons, took steps, commencing in May, 1925, to locate in California a 160 acre tract of land referred to as the Big Keen No. 2 placer claim. To this end Widdess drilled a well, referred to as Well No. 47, in May and June of 1925, and found what was described as "seams of blue shale containing a trace of boric acid." On January 7, 1927, Widdess and his associates deeded such rights as they had in respect of this tract to the appellant. On March 8 of the same year, the appellant made an admittedly valid discovery of borax on the tract in a well referred to as Well No. 62; on July 13, it filed an application in the United States Land Office at Los Angeles, California, for a patent to the entire tract of 160 acres. Omitting reference to intermediate proceedings not here material, this application was ultimately disallowed by the appellee, except as to 20 acres immediately surrounding the discovery in Well No. 62. This disallowance was upon the three grounds that: four of Widdess' associates were not *bona fide,* so that the area available for location and patent was in any event not greater than 80 acres; the "trace of boric acid" assertedly found in Well No. 47 did not fulfil the legal requirements for discovery, so that at the time of the conveyance to the appellant on January 7, 1927, there had been no perfected location; when the valid discovery of March 8, 1927, was made, in Well No. 62, there was but one individual claimant, the corporation appellant, and that it was as such entitled to but 20 acres. The question whether four of Widdess' associates were *bona fide* is out of the case; there is now no contention on the part of the appellant that it is entitled to more than 80 acres. Also—and properly—there is no serious contention that the discovery in Well No. 47 was valid.[6] There remains as the sole substantive question that of the correctness of the third ground upon which the appellee based his disallowance, except in respect of 20 acres, of the application. That question may be otherwise stated as follows: Is the transferee of an association placer claim of more than 20 acres, who, after the transfer, makes a discovery, entitled to a patent to more than the 20 acres immediately surrounding the

---

[1] Rev.Stat. § 2319 (1878), 30 U.S.C. § 22 (1934), 30 U.S.C.A. § 22.

[2] Rev.Stat. § 2329 (1878), 30 U.S.C. § 35 (1934), 30 U.S.C.A. § 35.

[3] Rev.Stat. § 2320 (1878), 30 U.S.C. § 23 (1934), 30 U.S.C.A. § 23.

[4] Rev.Stat. § 2330 (1878), 30 U.S.C. § 36 (1934), 30 U.S.C.A. § 36.

[5] Rev.Stat. § 2331 (1878), 30 U.S.C. § 35 (1934), 30 U.S.C.A. § 35.

[6] In the brief of the appellant at page 4 it is stated: "A second question, which would only arise in the event the preceding question [the principal question in the case] be answered in the negative, is one of mixed law and fact, and is whether the mineral showing in Well No. 47 drilled in May-June, 1927 [1925],

prior to the transfer to petitioner, constituted a valid discovery within the meaning of the mining statute requiring discovery." But at page 40 of the appellant's brief it is stated: "While this question as to whether a discovery exists in a particular case is a mixed question of fact and law (See Stewart Mining Co. v. Ontario Mining Co., 237 U.S. 350, 356 [35 S.Ct. 610, 59 L.Ed. 989], where a similar question as to the existence of the apex of a vein arose), nevertheless, we appreciate that it may be held not properly questioned on this appeal." In any event, the showing in Well No. 47 was not sufficient to constitute discovery. Chrisman v. Miller, 197 U.S. 313, 25 S. Ct. 468, 49 L.Ed. 770 (1905); United States v. Lillibridge, 4 F.Supp. 204, 206 (D.C.S.D.Cal.1932).

discovery? There is a further question concerning the propriety, under the circumstances of the case, of the remedy of mandamus.

Attacking the position of the appellee in refusing a patent for the entire 80 acres, and the decision of the trial court in refusing to issue a writ of mandamus, the appellant urges the following considerations and authorities, which we discuss seriatim:

■ 1. A prospector's possession of public mineral land prior to discovery is entitled to protection against forcible, fraudulent or clandestine intrusion, and this right of possession is transferable. This is the law. Union Oil Co. v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919); Rooney v. Barnette, 200 F. 700, 710 (9 Cir., 1912). Appellant contends that from this proposition it follows that the transferee of an association has after transfer exactly the right that the transferor had, to wit, the right to perfect through a single discovery the entire tract entered by the association, rather than the mere 20 acres immediately surrounding the discovery. We think this does not necessarily follow. To reach this conclusion from the premise stated is to beg the substantive question involved.

2. The appellant urges that the California courts have passed on the substantive question under discussion and that their rulings have been contrary to the conclusion reached by the appellee and the trial court. The appellant cites Miller v. Chrisman, 140 Cal. 440, 73 P. 1083, 74 P. 444, 98 Am.St.Rep. 63 (1903), and Merced Oil Mining Co. v. Patterson, 153 Cal. 624, 96 P. 90 (1908). In Miller v. Chrisman, one Barieau and seven others, as an association of persons, in 1895 entered upon a 160 acre tract of public land in California for the purpose of developing oil. Barieau claimed in the same year to have seen seepage oil upon the tract and asserted this to be a discovery. On December 24, 1896, Barieau and his associates conveyed to Miller. On December 31 of the same year, Miller executed a purported abandonment of the tract, but later on the same day took possession again on behalf of himself and seven others, as an association. On the following day, January 1, 1897, the defendants, A. Y. and H. T. Chrisman, entered upon the tract. Their entry, however, was not, as was ultimately determined, in good faith, and they did no work upon the land and made

no discovery. On July 31, 1897, Miller's associates conveyed their rights to him. Miller then leased the tract and in October, 1897, his lessee made a valid discovery. Finally on December 22, 1898, one Fewel entered upon the tract. His entry, however, was at night and, as ultimately found, clandestine and fraudulent. Suit was brought by Miller against the Chrismans to quiet title; Fewel intervened. No issue was raised in the California courts by the Chrismans as to the right of Miller to validate by the discovery of October, 1897, the location of the entire 160 acre tract. The Chrismans' position was that Miller's abandonment was fictitious and fraudulent, in that it was intended to accomplish an avoidance of assessment work required upon a location perfected by a valid discovery. This contention the Supreme Court of California disposed of in Miller's favor by holding that the sighting of seepage oil by Barieau did not constitute a valid discovery, and that therefore no location had been perfected prior to Miller's abandonment and re-entry, so that no duty of assessment work had arisen; the court held therefore that the re-entry of Miller after abandonment was valid and the Chrismans' entry invalid. The issue as to the perfection of location of the entire tract by the discovery of October, 1897, by Miller's lessee, that is, after Miller's associates had conveyed to him, was raised by Fewel. In disposing of this the Supreme Court of California held first that Fewel's entry, because "fraudulent, surreptitious, and clandestine," could not be the basis of any right. But the court also ruled against Fewel and in favor of Miller by holding that Miller could perfect the location of the entire 160 acres by the discovery of October, 1897. On this subject the court, speaking through Henshaw, J., said:

"... the law expressly provides that if one of the co-locators abandons his claim or interest, by refusing to bear his proportion of the cost of the assessment-work, such abandonment does not, as would be claimed, work the destruction of the whole location, but 'his interest in the claim shall become the property of his co-owners who have made the required expenditures.' ... It is undisputed that when the location has once been perfected one of the associates may by conveyance acquire all of the rights of his fellows, and we can perceive no reason

why the right to prosecute the work and perfect such a location by discovery may not itself be vested in a single one of them. If, instead of conveying, the seven associates had stood idle and refused to contribute their share to the necessary work of developing, and Miller . . . had alone prosecuted the work to a successful discovery, no one could contend in the face of section 2324 of the Revised Statutes of the United States [30 U.S.C.A. § 28], but that Miller would have acquired the rights of all, and would have had a perfected location covering the whole one hundred and sixty acres. If, then, by their abandonment, without a conveyance, Miller would have acquired the right to prosecute the work and perfect the whole location for himself individually, it is impossible to see why a conveyance to him of their right, instead of an abandonment of it by a refusal to join in the work, should effectuate any different result." [140 Cal. at 451, 73 P. at 1086]

In Merced Oil Mining Co. v. Patterson, this ruling in Miller v. Chrisman was extended so as to apply to conveyance by an association of a partial interest to a stranger, as distinguished from a member of the association, provided it had been agreed that discovery by the stranger should inure both to his benefit and that of the association. The appellant points further to the fact that Miller v. Chrisman as decided by the Supreme Court of California has from time to time been cited, referring by way of example to United States v. North American Oil Consolidated, 242 F. 723 (D.C.S.D.Cal. 1917), wherein, in the course of discussing a question arising under the Pickett Act, [7] the court remarked that the right of possession of mineral lands prior to discovery was entitled to protection against forcible or clandestine entry or intrusion by third parties, and was transferable, citing Miller v. Chrisman.

In our view the rulings in the California courts as evidenced by Miller v. Chrisman and Merced Oil Mining Co. v. Patterson, supra, are not conclusive of the substantive question here. Miller v. Chrisman was a suit between rival claimants only, and therefore is not a decision against the United States. That is to say, while it may be argued that under the reasoning of Miller v. Chrisman the prediscovery transferee of an association location may, against the United States as well as against a rival claimant, perfect by a single discovery after transfer, a location of a tract greater in area than 20 acres, the case does not actually decide this, because the United States was not a party. In McLemore v. Express Oil Co., 158 Cal. 559, 112 P. 59, 139 Am.St. Rep. 147 (1910), Henshaw, J., the same judge who spoke for the court in Miller v. Chrisman, himself recognized that, notwithstanding the ruling in Miller v. Chrisman, no vested rights which Congress is obliged to recognize arise until discovery. McLemore v. Express Oil Co. was an ejectment suit brought by McLemore. The Oil Company was the grantee of the prediscovery possessory rights of eight associates who had entered upon placer ground. Development work had been done and improvements made upon the tract and the cost thereof largely exceeded the amount required by the laws of the United States for post-discovery assessment work. McLemore, who claimed under the homestead laws, entered the tract at a time when there was no actual possession by either the Oil Company's grantors or the Oil Company itself. The Oil Company, however, relied upon the development work and improvements as if they were assessment work. The Supreme Court of California held that McLemore must prevail; that continuous actual possession was necessary to protect a prediscovery locator, and that the assessment work applicable after discovery could not be relied upon. In the course of the opinion, Henshaw, J., cited Miller v. Chrisman to the effect that one who in good faith makes a location, remains in possession, and with due diligence prosecutes his work towards discovery, is protected against forcible, fraudulent, or clandestine intrusion. But he said also:

"But it is always to be borne in mind that until the perfection of the inchoate and incomplete location by discovery, the locator has, first, no vested rights which Congress is obliged to recognize. So that Congress

[7] Act of June 25, 1910, 36 Stat. 847, c. 421, § 2, 43 U.S.C.A. § 142. This Act saved, in respect of oil or gas lands, the rights of persons who at the date of withdrawal of public lands from entry were *bona fide* occupants or claimants in diligent prosecution of work leading to discovery.

may change its policy in regard to the lands to the extent even of excluding therefrom the diligent operator who has not made discovery. However inequitable such a proceeding might be, it in no way would be illegal." [158 Cal. at 563, 112 P. at 60]

This same distinction between the right of one prediscovery claimant against another, and the right of such a claimant against the United States, was recognized *obiter* by the Supreme Court of the United States in Perego v. Dodge, 163 U.S. 160, 16 S.Ct. 971, 41 L.Ed. 113 (1896), where, in the course of a discussion of the appropriateness of a bill in equity as a remedy for quieting title to mining ground, the Court said:

"It must be remembered that it is 'the question of the right of possession' which is to be determined by the courts, and that the United States is not a party to the proceedings. The only jurisdiction which the courts have is of a controversy between individual claimants, and it has not been provided that the rights of an applicant for public lands as against the government may be determined by the courts in a suit against the latter. [Citing authorities]

"It was held by Mr. Justice Lamar, when Secretary of the Interior, that, notwithstanding the judgment of a court on the question as to the right of possession between two litigants, it still remained for the land department to pass on the sufficiency of the proofs, and to ascertain the character of the land and whether the conditions of the law had been complied with in good faith before the government parted with the title. . . ." [163 U.S. at 168, 16 S.Ct. at 975]

See also Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 24 S.Ct. 632, 48 L.Ed. 944 (1904).

The force of Miller v. Chrisman is moreover much weakened by a defect in the reasoning of the opinion. It will have been noted that in support of the decision of the issue between Miller and Fewel in favor of Miller—that is, of the ruling that Miller could perfect location of the entire 160 acres by the discovery of October, 1897—Henshaw, J., referred to the fact that, if one of several co-locators abandons his claim or interest by refusing to bear his proportion of the cost of assessment work, such abandonment does not work the destruction of the whole location, but, under the express terms of Rev.Stat. § 2324 (1878), 30 U.S.C. § 28 (1934), 30 U.S.C.A. § 28, "his interest in the claim shall become the property of his co-owners who have made the required expenditures." He reasoned from this that if prior to discovery Miller's seven associates had stood idle and refused to contribute their share to the necessary work of developing the claim, and Miller had under such circumstances alone prosecuted the work to successful discovery, then under the statute referred to Miller would have acquired the rights of all; wherefore Henshaw, J., concluded:

"If, then, by their abandonment, without a conveyance, Miller would have acquired the right to prosecute the work and perfect the whole location for himself individually, it is impossible to see why a conveyance to him of their right, instead of an abandonment of it by a refusal to join in the work, should effectuate any different result." [140 Cal. at 451, 73 P. at 1086]

But Rev.Stat. § 2324 has to do only with assessment work required after a location has been perfected by discovery. This is apparent from the terms of the statute, and was also pointed out in McLemore v. Express Oil Co., supra. While therefore there was a statutory provision upon which could be based a conclusion to the effect that conveyance by co-locators after discovery will not work a destruction of the whole location, there is no statutory provision from which a similar conclusion can be reached in respect of conveyance by co-locators before discovery.

Merced Oil Mining Co. v. Patterson, supra, like Miller v. Chrisman, was a contest between rival claimants and not a contest by a claimant against the United States.

United States v. North American Oil Consolidated, supra, in which, as pointed out by the appellant, Miller v. Chrisman was cited, was not on its facts a controversy in respect of the substantive question in issue in the instant case. Moreover, Miller v. Chrisman was cited merely for the proposition that prediscovery possession would be protected by the courts from intrusion by private parties.

3. Miller v. Chrisman reached the Supreme Court of the United States. Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770 (1905). The appellant relies upon the decision of the case there as an

implied holding that the discovery in October, 1897, by Miller's lessee, after Miller's associates had conveyed to him, operated to perfect location of the entire 160 acre tract; that is to say, the appellant relies upon the decision in the Supreme Court as in effect disposing in its favor of the substantive question in the instant case.

Chrisman v. Miller in the Supreme Court of the United States does not, we think, impliedly hold what the appellant claims for it. As between Miller and Fewel, who entered December 22, 1898, to wit, after transfer to Miller by his associates and after the discovery by Miller's lessee, there was in the California courts a question as to the diminution of Miller's claim to a 20 acre tract. Even if Fewel's entry had been of a legally recognizable character, still, if Miller could perfect, by virtue of his lessee's discovery, location of the entire 160 acre tract, Fewel could claim nothing; whereas if Miller was reduced to perfection of location of the 20 acre tract upon which his lessee made discovery, Fewel might claim a right to locate upon some part of the remainder. But since Fewel did not appeal, the issues between Miller and Fewel were not before the Supreme Court of the United States for a ruling. It is true that the Chrismans attempted to present the same point in their own behalf by specifications of error and by argument in their brief. But since at the time of the Chrismans' entry on January 1, 1897, no conveyance had yet been executed by Miller's associates to him, no question as between the Chrismans and Miller as to the diminution of Miller's claim to a 20 acre tract could arise, since the Chrismans had not re-entered after the conveyance to Miller, except upon the theory that although the Chrismans' entry on January 1, 1897, was then invalid, still, after the transfer to Miller on July 31, 1897, the Chrismans' entry might, to the extent that Miller's rights were diminished by the transfer, be held valid as a foundation for a 20 acre location by the Chrismans. But we think that the Supreme Court cannot be said to have ruled *sub silentio* in favor of such an extreme position, especially in view of the lack of good faith in the Chrismans' entry. Moreover, it is apparent that the Supreme Court itself considered that, as between the Chrismans and Miller, there was in a proper sense no question in the case except in respect of the validity of the Chrismans' entry, because after the decision went against the Chrismans in the Supreme Court they filed a petition for a rehearing and in that petition urged that the Court had failed to pass upon the question whether, as between them and Miller, the latter's rights had been diminished by the prediscovery transfer to him. Notwithstanding this, the petition for rehearing was denied. See Petition for Rehearing filed April 29, 1905, and Docket of the United States Supreme Court for the October Term, 1904, Case No. 171.

■ It is to be noted further, in respect of Chrisman v. Miller, that since the case was not disposed of in the Supreme Court upon the theory that Miller obtained rights, by the transfer from his associates, through which he might by discovery after the transfer validate location of the entire tract, but on the contrary upon the ground that the nature of the Chrismans' entry was such that they had no rights at all which they could urge as against Miller, whatever Miller's rights might be, the appellant can gain no comfort from a theory that the Supreme Court affirmed the case for Miller upon the conventional proposition that in an ejectment suit the plaintiff must prevail upon the strength of his own title rather than upon the weakness of the defendant's. As said in Haws v. Victoria Copper Mining Co., 160 U.S. 303, 16 S.Ct. 282, 40 L.Ed. 436 (1895):

"The elementary rule is that one must recover on the strength of his own and not on the weakness of the title of his adversary, but this principle is subject to the qualification that possession alone is adequate as against a mere intruder or trespasser without even color of title, and especially so against one who has taken possession by force and violence. This exception is based upon the most obvious conception of justice and good conscience. It proceeds upon the theory that a mere intruder and trespasser cannot make his wrongdoing successful by asserting a flaw in the title of the one against whom the wrong has been by him committed. . . ." [160 U.S. at 316, 317, 16 S.Ct. at 287, 288].

Or, as even better put in Brooks v. Wheeler, 243 N.Y. 28, 152 N.E. 454, 47 A.L.R. 549 (1926): "A weak title may be good as against no title whatever." Hence the decision in favor of Miller, in view of the Chrismans' wrongful entry, is not necessarily a decision that Miller had a right to validate location of the whole tract.

The appellant also urges Union Oil Co. v. Smith, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919). In that case an association of eight had entered upon a 160 acre tract in California and prior to discovery had conveyed its rights to the Union Oil Company. The latter did not maintain actual occupancy of this tract but took possession of an adjoining one upon which it commenced prediscovery work. A second group of eight persons then went into possession of the tract first mentioned, and this group, prior to discovery, conveyed to Smith. Suit was brought by Smith in the California courts to determine adverse claims, the Union Oil Company being made defendant. It relied upon the Act of February 12, 1903, 32 Stat. 825, 30 U.S. C.A. § 102, providing that annual assessment work may be done upon any one of a group of contiguous oil land locations, not exceeding five, in the same ownership, if this will tend toward their development or toward the determination of their oil bearing character. The Supreme Court of the United States, after reviewing the mining laws and pointing to the distinction between prediscovery and post-discovery rights, held that the Act of February 12, 1903, referred to locations upon each of which there had been a discovery, and that the Act had no purpose to break down the distinction between the mere *pedis possessio* of a prospector before discovery and the rights resulting from discovery and perfected location. And the Supreme Court therefore concluded that the Union Oil Company had gained no rights to the 160 acre tract as against Smith. The appellant urges that because Smith was a transferee prior to discovery, and was as a result of the decision in the Supreme Court of the United States allowed to remain in possession, as against the Union Oil Company, of the entire tract, the decision is an implied affirmance of Miller v. Chrisman as decided in the Supreme Court of California. Miller v. Chrisman was cited in Union Oil Co. v. Smith for the proposition that the California courts have recognized the right of a prospector before discovery, while in possession of his claim and diligently and in good faith prosecuting exploration work, to be a substantial interest extending not only as far as the *pedis possessio* but to the limits of the claim as marked out, and to be one entitled to protection as against violent, fraudulent and surreptitious intrusions. But Union Oil Co. v. Smith has no rele-vancy to the question under discussion, because discovery had not been made by either of the contesting claimants therein.

We conclude that the points made and authorities urged by the appellant do not operate to make the decision of the appellee disallowing the patent, except as to 20 acres, and the decision of the trial court refusing to issue a writ of mandamus, wrong.

We think moreover that certain further considerations demonstrate the decision of the appellee and of the trial court to have been right.

One such consideration is that the construction which the appellant puts upon the statutory provisions primarily involved would permit the accomplishment indirectly, through the device of an association transfer, of what cannot be accomplished directly. It is clear that if a non-association claimant, either individual or corporate, wishes to locate eight contiguous 20 acre tracts, it must make a discovery on each of such tracts, this because Rev.Stat. § 2331, 30 U.S.C.A. § 35, which was enacted in 1872, provides that "no such [placer] location shall include more than twenty acres for each individual claimant," and because under the provisions of Rev. Stat. § 2329 and § 2320, 30 U.S.C.A. §§ 35, 36, above set forth, no location of a mining claim shall be made until there has been a discovery within the limits of the claim located, whether lode or placer. It is true that the language of Rev.Stat. § 2330, 30 U.S.C.A. § 36, "no location of a placer-claim . . . shall exceed one hundred and sixty acres for any one person or association of persons," would, standing alone, seem to warrant the location of a 160 acre placer claim by one person. But this provision was enacted in 1870, and we think that the words "person or" therein were impliedly repealed by Rev.Stat. § 2331, 30 U.S.C.A. § 35. This apparently was the view of the Supreme Court in St. Louis Smelting Co. v. Kemp, 104 U.S. 636, 26 L.Ed. 875 (1881). The Circuit Court of the United States for the District of Colorado had instructed the jury substantially as follows:

"That a patent for a mining claim, since the passage of the act of Congress of 1870, could not embrace more than one hundred and sixty acres; that individuals and associations were, by that act, put upon the same footing, and that either might take that amount, but that by the mining act of

Congress of 1872 an individual claimant was limited to twenty acres, whilst an association of persons could still take one hundred and sixty, as before . . . ." [104 U.S. at 638, 639]

The trial court was reversed upon another point, but apparently without disagreement with the proposition set forth in that portion of the instruction above quoted—because the Supreme Court in its opinion commented upon the sequence of the statutes as follows:

"Placer claims first became the subject of regulation by the mining act of July 9, 1870, c. 235 (16 Stat. 217), which provided that patents for them might be issued under like circumstances and conditions as for vein or lode claims, and that persons having contiguous claims of *any size* might make joint entry thereof. But it also provided that no location of a placer claim thereafter made should exceed one hundred and sixty acres for one person or an association of persons. The mining act of May 10, 1872, c. 152 (17 id. 91), declared that a location of a placer claim subsequently made should not include more than twenty acres for each individual claimant. . . ." [104 U.S. at 650, 651]

To the effect that the courts will discountenance the accomplishment indirectly of what cannot be accomplished directly under the mining laws, see Nome & Sinook Co. v. Snyder, 187 F. 385 (9 Cir. 1911). In that case five individuals attempted to locate as an association upon 100 acres. By agreement between them, two were to have but a nominal interest in the claim, one less than one-fifth, one largely more than one-fifth, and one more than one-half. After discussing the very statutory provisions involved in the instant case, the court held that the scheme was illegal and the location void because of the attempt to obtain for an individual more than 20 acres. And see Cook v. Klonos, 164 F. 529 (9 Cir. 1908). Such rulings are in accord with the general policy of the mining laws of the United States. This has been to promote widespread development of mineral deposits and to afford mining opportunities to as many persons as possible. See Costigan, Mining Law (1908) § 2, pp. 6-7.[8] To permit an individual prediscovery transferee to validate by a single discovery, subsequent to transfer, the location of an entire 160 acre tract would result in the development of minerals within a small portion of the tract only, and would be also to foreclose mining opportunity upon the balance to other individuals.

---

8 ". . . in St. Louis Smelting & Refining Co. v. Kemp [104 U.S. 636, 649, 650, 26 L.Ed. 875], 'Mr. Justice Field said: 'Previously to the act of July 9, 1870, Congress imposed no limitation to the area which might be included in the location of a placer claim. This, as well as every other thing relating to the acquisition and continued possession of a mining claim, was determined by rules and regulations established by miners themselves. Soon after the discovery of gold in California, as is well known, there was an immense immigration of gold seekers into that territory. They spread over the mineral regions, and probed the earth in all directions in pursuit of the precious metals. Wherever they went they framed rules prescribing the conditions upon which mining ground might be taken up—in other words, mining claims be located and their continued possession secured. Those rules were so framed as to give to all immigrants absolute equality of right and privilege. The extent of ground which each might locate—that is, appropriate to himself—was limited, so that all might, in the homely and expressive language of the day, have an equal chance in the struggle for the wealth there, buried in the earth. * * * The rules and regulations originally established in California have in their general features been adopted throughout all the mining regions of the United States. They were so wisely framed, and were so just and fair in their operation, that they have not to any great extent been interfered with by legislation, either state or national. In the first mining statute, passed July 9, 1866, they received the recognition and sanction of Congress, as they had previously the legislative and judicial approval of the states and territories in which mines of gold and silver were found.'

"The fundamental thing to bear in mind about these early mining rules and customs, which related to district boundaries, the size and method of location of claims, the keeping of records by a district recorder, the amount of work required to keep a location alive, the way in which claims could be forfeited when they should be deemed abandoned, etc., is that they are the foundation stones upon which our American mining law has been built. They have been called the American common law of mining."

A further and final and perhaps the most cogent consideration supporting the decision of the appellee and the trial court upon the substantive question under discussion is the following: In H. H. Yard, 38 L.D. 59 (1909), the Secretary of the Interior had ruled that a gold placer location of 160 acres made by eight persons, who subsequently conveyed to a single individual before discovery, could not be perfected by the transferee through discovery after the transfer, and in this case Chrisman v. Miller was cited, although apparently only upon the question of what constitutes a valid discovery. Subsequently in Bakersfield Fuel & Oil Co., 39 L.D. 460 (1911), the Secretary made a similar ruling in respect of an oil placer location, and in that decision Miller v. Chrisman, as decided in the Supreme Court of California, was referred to as a state court decision clearly adverse to the doctrine of the H. H. Yard Case, and Chrisman v. Miller, as decided in the Supreme Court of the United States, was described as not adopting the doctrine laid down by the Supreme Court of California. It appears also in Bakersfield Fuel & Oil Co. that it had been called to the attention of the Secretary that the rule of the H. H. Yard Case would, as applied to oil placer locations, work hardship, because it had for many years been a common practice in California in the development of oil lands for an association of eight persons to locate upon 160 acres as a single placer mining claim and then prior to discovery to convey to a corporation. This practice had been sanctioned by the Department of the Interior and patents issued under it until the H. H. Yard decision. But the Secretary commented that if the interpretation of the law in the H. H. Yard Case in respect of gold placer locations, and reiterated in Bakersfield Fuel & Oil Co. in respect of oil placer locations, was inequitable, relief could be secured through Congress, and he noted that remedial legislation had been recommended to Congress in respect of *bona fide* locators who, relying upon the practice in existence prior to the H. H. Yard Case, had diligently prosecuted their work to fruition. As the apparent result of this recommendation Congress passed the Act of March 2, 1911, 36 Stat. 1015, c. 201, 30 U.S.C.A. § 103, reading as follows:

"An Act To protect the locators in good faith of oil and gas lands who shall have effected an actual discovery of oil or gas on the public lands of the United States, or their successors in interest.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in no case shall patent be denied to or for any lands heretofore located or claimed under the mining laws of the United States containing petroleum, mineral oil, or gas solely because of any transfer or assignment thereof or of any interest or interests therein by the original locator or locators, or any of them, to any qualified persons or person, or corporation, prior to discovery of oil or gas therein, but if such claim is in all other respects valid and regular, patent therefor not exceeding one hundred and sixty acres in any one claim shall issue to the holder or holders thereof, as in other cases: *Provided, however,* That such lands were not at the time of inception of development on or under such claim withdrawn from mineral entry."

The Senate and House Committee Reports,[9] which recommend the passage of this legislation and which include correspondence with the Secretary of the Interior on the subject of the legislation, show that Congress, in passing the Act, was fully advised of Miller v. Chrisman and Chrisman v. Miller and of the H. H. Yard and Bakersfield Fuel & Oil Co. decisions. Therefore with full knowledge of the departmental ruling and of the consequences thereof, Congress nevertheless modified that ruling in part only. That is to say, by virtue of the Act of March 2, 1911, Congress made the ruling of the Secretary of the Interior in the H. H. Yard and Bakersfield Fuel & Oil Co. Cases inapplicable to lands containing petroleum, mineral oil or gas, and located prior to the date of the Act, but it left the Secretary's ruling unmodified in respect of lands containing other kinds of mineral and in respect of all lands located under the mining laws after the date of the Act. Thus it left the ruling of the Secretary unmodified in respect of such claims as the borax claim of the appellants in the instant case. If it cannot be said that by thus passing the Act of March 2, 1911, Congress finally determined the law, at least it must be said that Congress gave strong evidence of ap-

---

[9] Sen.Rep. 1179, 61st Cong., 3rd Sess. (1911); H.R.Rep. 2075, 61st Cong., 3rd Sess. (1911).

proval of the Secretary's ruling to the extent that it omitted to modify the same. The failure of Congress to amend a statute, after administrative rulings have been made construing or applying it, has been recognized as evidence of Congressional approval of such rulings. Costanzo v. Tillinghast, 287 U.S. 341, 53 S.Ct. 152, 77 L.Ed. 350 (1932); Corning Glass Works v. Robertson, 62 App.D.C. 130, 65 F.2d 476 (1933), certiorari denied 290 U.S. 645, 54 S.Ct. 63, 78 L.Ed. 559 (1933). Even more cogent evidence of Congressional approval of an administrative ruling must be affirmative action on the part of Congress modifying the ruling in part and leaving it otherwise standing.

We conclude on the merits of the substantive question in the instant case that the ruling of the appellee and of the trial court were correct.

 In respect of the further question in the case of the propriety of the remedy of mandamus: The law is settled that "Where the duty [of an administrative officer] in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command it is regarded as being so far ministerial that its performance may be compelled by mandamus . . . . But where the duty is not thus plainly prescribed but depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218, 219, 50 S.Ct. 320, 324, 74 L.Ed. 809 (1930). As stated in United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931), "The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable" if the writ of mandamus is to issue. See also United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, especially at 324, 325, 23 S.Ct. 698, 47 L.Ed. 1074 (1903); United States ex rel. Ness v. Fisher, 223 U.S. 683, 32 S.Ct. 356, 56 L.Ed. 610 (1912); Noble v. Union River Logging R. Co., 147 U.S. 165, 13 S.Ct. 271,

37 L.Ed. 123 (1893). We felt obliged to apply this rule in O'Brien v. Lane, 40 App. D.C. 493 (1913), where, in order to determine whether or not an applicant was entitled to make a homestead entry as the assignee of one claiming rights under the homestead laws, it was necessary for the Secretary of the Interior to construe the statutes. And more recently in Calf Leather Tanners' Ass'n v. Morgenthau, 65 App.D.C. 93, 80 F.2d 536 (1935), certiorari denied 297 U.S. 718, 56 S.Ct. 595, 80 L.Ed. 1003 (1936), wherein, in order to determine the dutiability of certain leather imports, it was necessary for the Secretary of the Treasury to construe a customs statute, we held that the writ of mandamus could not issue, saying:

"It is of course settled that if a duty imposed by law is plain, an administrative officer must perform that duty and is subject to mandamus if he refuses. He cannot rely upon the mere necessity of reading a statute or decision in respect of its applicability to facts before him and thereby capriciously, under the pretense of the exercise of discretion, avoid a plain duty. [Citing authorities] But the law is equally clear that where an exercise of judgment or discretion by an administrative officer is necessary in determining his duty, mandamus will not lie. [Citing authorities]" [65 App.D.C. at 98, 99, 80 F.2d at 541, 542]

Still more recently we have reiterated this rule in United States ex rel. Kansas City Southern Ry. Co. v. Interstate Commerce Commission et al., 68 App.D.C. 396, 98 F.2d 268, decided by this Court May 2, 1938; United States ex rel. White v. Coe, 68 App.D.C. 218, 95 F.2d 347 (1938); United States ex rel. Corbin v. Doyle, 68 App.D.C. 100, 93 F.2d 646, 650 (1937).

The conclusion that the decision of the appellee in disallowing the patent in respect of any lands exceeding 20 acres was as a matter of law correct, makes clear that the appellee had reasonable grounds for his decision. For that reason alone no writ of mandamus could properly issue against him.

Affirmed.